## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| ROCCO J. LEO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 06-S-625-NE |
| | ) | |
| TS TECH ALABAMA, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Stacy Morris filed this employment discrimination action against TS Tech Alabama, LLC ("TST") on March 29, 2006.[1]  On October 13, 2006, however, Morris filed a voluntary Chapter 7 bankruptcy petition in the United States Bankruptcy Court for the Northern District of Alabama.[2]  After being apprised of the bankruptcy filing, this court permitted the trustee in bankruptcy, Rocco J. Leo, to intervene as plaintiff and to prosecute this action as the real party in interest.[3]  *See* 11 U.S.C. § 541; Fed. R. Civ. P. 17(a).

The action now is before the court on TST's motion for summary judgment.[4]

---

[1] *See generally* doc. no. 1 (Complaint).

[2] *See* doc. no. 14 (Suggestion of Bankruptcy).

[3] *See* doc. no. 30 (Order Staying Case Pending Possible Intervention); doc. no. 35 (Order Granting Motion to Intervene).

[4] Doc. no. 15 (Motion for Summary Judgment).

In support of the motion, TST asserts that the wantonness / negligence claims, and the hostile work environment, retaliation, and sex discrimination claims set forth in the complaint are substantively deficient.

Furthermore, TST notes that Morris did not identify this action as an asset in her original filing with the Bankruptcy Court, and did not amend her petition to correct this omission until January 12, 2007 — three days after TST filed a suggestion of Morris's bankruptcy herein, and just four days prior to the "bar date" on the petition. Accordingly, TST also seeks dismissal of this lawsuit pursuant to the doctrine of judicial estoppel. *See generally Barger v. City of Cartersville*, 348 F.3d 1289, 1293-97 (11th Cir. 2003). The court need not tarry long in addressing the judicial estoppel argument, because the person alleged to have made inconsistent statements (Morris), is no longer a party to this lawsuit.[5] In such circumstances, the Eleventh Circuit has squarely held that judicial estoppel does not apply. *See Parker v. Wendy's International, Inc.*, 365 F.3d 1268, 1269 (11th Cir. 2004) ("[B]ecause the party pursuing this case against Wendy's is not Parker, but is instead the bankruptcy trustee — who did not make any inconsistent statements to the courts — we hold that judicial estoppel does not apply."). *See also id*. at 1272.

With that issue resolved, the court moves on to address the other grounds

---

[5] *See generally* doc. no. 35.

articulated in the motion for summary judgment.

## PART ONE

### *Summary Judgment Standards*

Federal Rule of Civil Procedure 56 indicates that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).[6]  In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  Inferences in favor of the non-moving party are not unqualified, however.  "[A]n inference is not reasonable if it is

---

[6] Rule 56 was recently amended in conjunction with a general overhaul of the Federal Rules of Civil Procedure.  The Advisory Committee was careful to note, however, that the changes "are intended to be *stylistic only*."  Adv. Comm. Notes to Fed. R. Civ. P. 56 (2007 Amends.) (emphasis supplied).  Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983). Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921). *See also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## PART TWO

*Summary of Relevant Facts* [7]

Defendant TS Tech Alabama, LLC ("TST") operates a plant in Boaz, Alabama, at which the company manufactures seats for Honda vehicles.[8] Stacy Morris, a Caucasian female, began working the second shift (which commences at

---

[7] ***Nota bene:*** at the summary judgment stage, the court must "recount the facts in the light most favorable to . . . the non-moving party." *Wood v. Kesler*, 323 F.3d 872, 875 n.1 (11th Cir. 2003). "For that reason, what [is] set out in this opinion as 'the facts' for summary judgment purposes may not be the actual facts." *Id. See also*, *e.g.*, *Matthews v. Crosby*, 480 F.3d 1265, 1269 (11th Cir. 2007) (same).

[8] Doc. no. 20 (Brief in Support of Summary Judgment), Statement of Undisputed Facts, ¶ 1; Deposition of Stacy Morris ("Morris Depo."), at 29.

approximately 4:00 p.m.) for TST on or about April 26, 2004.[9]  For the first four or five months of her employment, Morris was assigned to TST's "subassembly line," and her supervisor was Dwight Cagle.[10]   Morris had no complaints of sexual harassment while working under Cagle's supervision.[11]  Eventually, however, the subassembly line was closed, and Morris was reassigned to the "rear 60 line," where her supervisor was TST Team Leader Richie Andrews.[12]   It is Morris's alleged mistreatment during her time as an employee on the rear 60 line that is the subject of this lawsuit.

## A.    Allegations of Harassment Outside of Work

According to Morris and another ex-TST employee, Dustin McCullars, Team Leader Richie Andrews was generally flirtatious with all the women who worked on his line.[13]  Morris claims, however, that his attempts at inveigling her in particular reached the level of forcible groping at a private, non-work-related party in

---

[9] Doc. no. 20, Statement of Undisputed Facts, ¶ 3; Morris Depo., at 25, 30, 113; Declaration of Stacy Morris ("Morris Decl."), ¶¶ 1, 2.  For obvious reasons, the second shift is less desirable than the first shift, so Morris placed her name to a waiting list for a transfer to first shift immediately. Morris Depo., at 30.  Her transfer request was never granted.

[10] Morris Depo., at 26, 30.

[11] Doc. no. 26 (Brief in Opposition to Summary Judgment), Statement of Undisputed Facts, ¶ 104.

[12] Morris Depo., at 31, 36, 37; doc. no. 20, Statement of Undisputed Facts, ¶ 8.

[13] Morris Depo., at 72; Declaration of Dustin McCullars ("McCullars Decl."), ¶ 3.

September 2004.[14]  It all started while Morris was still at work:  she received a call on her Nextel two-way radio from her friend Erik Harris, another TST employee, who invited her to an after-work party to be held at a private residence at the conclusion of the second shift that night.[15]  Although Morris and another worker, Angela Douglas, anticipated having to work beyond their normal quitting time that night, Andrews allegedly took it upon himself to arrange for them to leave work exactly at 2:00 a.m. so they could make it to the party in a timely manner.[16]  Shortly after Morris and Douglas arrived at the party, Andrews showed up.[17]  This was the not the first time that Morris attended a party with her co-workers, but it was the first time that she and Andrews were both at such a party simultaneously.[18]  After a few minutes of standing around, Morris contends that Andrews sat down beside her.[19]  Eventually, some or all of the other attendees left the room, and Andrews allegedly "grabbed [Morris] and began kissing . . . and fondling [her]."[20]  This physical contact lasted only "a few seconds," and then Andrews stood up, unzipped his pants, and began

---

[14] Doc. no. 20, Statement of Undisputed Facts, ¶¶ 8-9.

[15] Morris Depo., at 76-77.

[16] *Id*. at 78, 86-87.

[17] *Id*. at 85.

[18] *Id*. at 85.

[19] *Id*. at 89.

[20] *Id*. at 91.

walking toward a bedroom.[21]   Morris claims that she left the party instead of following him.[22]

Although the facts must be viewed in the light most favorable to Morris, it should be noted that Andrews vigorously disputes her account.  In a declaration submitted along with TST's motion for summary judgment, Andrews states that it was *he* who was fondled by a "very, very drunk" Morris.[23]  Morris admits that she had consumed "[p]robably two beers" by the time the encounter took place, but, of course, denies that she was the initiator.[24]

## B.    Allegations of Harassment During Work

Back at work on the Monday after the party, Andrews allegedly apologized to Morris for his behavior and told her that "it wouldn't happen again."[25]   Morris concedes that Andrews never touched her after this incident, but she alleges that he began treating her in a "mean" and "hateful" manner at work.[26]   Asked to provide examples of this treatment, Morris stated that "whenever I wanted to go to the

---

[21] *Id*. at 91-92.

[22] Morris Decl., ¶ 5.

[23] Declaration of Richie Andrews ("Andrews Decl."), ¶ 5.

[24] Morris Depo., at 90.

[25] Doc. no. 20, Statement of Undisputed Facts, ¶ 11 (quoting Morris Depo., at 93).

[26] *Id*. at ¶ 13; Morris Depo., at 48, 93-94.

restroom, he would say I would have to wait."[27]  Morris also expressed discontent that Andrews was "extra nice" to two other workers — Brandy Parker and an unidentified African American woman — providing assistance and guidance to them while refusing to give Morris the help she felt necessary.[28]  Finally, she claims that on more than one occasion Andrews "pulled" her into his office "just because he thought [she] had an attitude,"[29] although she admits that no formal discipline was imposed as a result of these office meetings.[30]

Morris also complains about how other TST employees treated her while she worked on the rear 60 line.  For example, Morris testified that on several occasions she heard male co-workers and superiors engaging in discussions "amongst themselves" about engaging in sexual intercourse with various female employees, even going so far as to make bets as to whether they could convince the female employees to sleep with them.[31]  In that same vein, Morris alleges that TST Team

---

[27] Morris Depo., at 94.  *See also* doc. no. 20, Statement of Undisputed Facts, ¶ 13.

[28] Morris Depo., at 96-98.

[29] *Id*. at 48.

[30] *Id*. at 48.  *See also* doc. no. 20, Statement of Undisputed Facts, ¶ 21 ("Plaintiff is aware that a verbal counseling is different from a write-up in that it does not count against an employee's performance record or affect entitlements such as the right to be considered for transfer or promotion.").

[31] Morris Depo., at 74.  *See generally id*. at 73-75; 145-46.  Dustin McCullars, Morris's ex-co-worker on the rear 60 line, echoes these allegations, stating in his declaration that he also "overheard the trainers making bets about having sex with female employees."  McCullars Decl., ¶ 8.

Leader Devaughn Moore relayed to her a conversation he had with Plant Manager Jason Trussell, in which Trussell stated that Morris "had a body like a brick S house."[32]

Another person whose name comes up repeatedly in Morris's deposition — and in the sworn declaration of her ex-co-worker, Dustin McCullars — is Chris Dakin, a Trainer for TST who occasionally socialized with Morris outside of work.[33]  (It is not clear whether Morris is intimately acquainted with the job duties of Trainers, but she testified that they "make sure the line runs well and help you if you need help."[34]) In early December 2004, Dakin allegedly "nudged" Morris on her breasts; when she responded by saying "excuse you," he allegedly replied, "well, you have enough to spare."[35]  Around that same time, Dakin allegedly stated twice that he would like to "stick his penis in her ass," referring to Morris and also to Brandy Parker, who was standing nearby.[36]  Later, in mid-December, Morris claims that Dakin called her a

---

[32] Morris Depo., at 101.  *See generally id*. at 101-03.  In a declaration submitted in conjunction with TST's motion for summary judgment, Moore denies ever hearing Trussell make this statement.  Declaration of Devaughn Moore ("Moore Decl."), ¶ 3.

[33] *See*, *e.g.*, Morris Depo., at 53.

[34] Doc. no. 20, Statement of Undisputed Facts, ¶ 25 (quoting Morris Depo., at 17).

[35] Morris Depo., at 51.

[36] *Id*. at 103-04.  Dakin disputes that he made either of these comments.  *See* Affidavit of Chris Dakin ("Dakin Aff."), ¶ 5.

"stupid B" and a "F'ing retard."[37]

On January 24, 2005, while Morris and Dakin were both working on the rear 60 line, Darkin noticed that an equipment cart (or "buggy") had been left in an aisle, and then instructed Morris to "move them MF'ing buggies out of the way."[38]   Later during the same shift, Dakin observed Morris pausing for a moment after working with another employee to repair an improperly assembled seat.  Dakin sarcastically asked Morris whether she was "going to stand there with [her] F'ing finger up [her] A."[39]  After she stated that she was preparing to return to the line, Dakin "started cussing and telling [Morris that] if [she] didn't want to do [her] GD job, [she] could go to the F'ing house."[40]

Although Dustin McCullars did not witness these events, in his declaration he alleges that "Dakin had a problem with female employees in general, and harassed females [including Morris] and treated them poorly in comparison to male

---

[37] Morris Depo., at 107.  Although Dakin characterizes any off-color comments as harmless banter between playful friends, and disputes making the "stupid bitch" remark, referring to Morris's breasts, or expressing his desire to engage in anal sex, he admits calling Morris a "fucking retard." Dakin Aff., ¶¶ 4-6.

[38] Morris Depo., at 115.

[39] *Id.* at 116.

[40] *Id.* at 117.  Dakin admits cursing Morris on this occasion, but remembers his exact words differently, and also claims that Morris offered up a vulgar rejoinder to his initial commentary.  *See* Dakin Aff., ¶ 7.

employees."[41]    He goes on to provide specific examples of Dakin's alleged

harassment of female employees.[42]

## C.    Reporting the Alleged Harassment

At all times pertinent to this lawsuit, TST had in place a policy prohibiting

sexual harassment and other forms of legally cognizable workplace discrimination.[43]

The first page of the policy states that "[a]ny [a]ssociate who believes they have been

the subject of harassment should report the alleged act immediately to their supervisor

*or* the Human Resource Department."[44]    Another portion of the policy "encourage[s]"

associates who believe they have been subjected to harassment "from either a co-

worker or a supervisor" to "identify the offensive behavior to the harasser and request

that it stop.    If the individual does not feel comfortable confronting his or her

harasser, or if the offensive behavior does not stop, the behavior should be reported

to the appropriate supervision of the Human Resource management."[45]    The policy

---

[41] McCullars Decl., ¶ 5.

[42] *See generally id.*

[43] Morris Depo., Ex. 9.

[44] *Id*. at 6-5 (emphasis supplied).

[45] *Id*. at 6-6 to 6-7.    The parties disagree as to whether the language "to the appropriate supervision *of* the Human Resource management" is the product of a typographical error, or mere awkward writing.    For reasons that will become clear below, the more favorable interpretation for the non-movant allows the aggrieved employee to report the harassing conduct to *either* supervision *or* to Human Resource management.    Because this latter interpretation is obviously reasonable given the context and the syntax, the court adopts it for summary judgment purposes.    *See, e.g., Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002) (holding that at summary judgment, the facts must be construed in the light most favorable to the non-movant.");    *EEOC v. Rio Bravo International*,

concludes that "[w]hen supervision *or* Human Resources is notified of alleged harassment, an investigation will promptly take place."[46]

Morris, who was familiar with this policy,[47] apparently did not confront Andrews about his alleged off-site groping of her in September 2004; as mentioned, however, Andrews himself allegedly followed up the next working day with an apology.  On the other hand, when Morris felt that Andrews was retaliating against her by acting "mean" and "hateful" subsequent to the sexual encounter, she confronted him about it, but he merely "shrugged his shoulders and walked off."[48]

About one month after being reassigned to Andrews's line, Morris allegedly submitted two formal requests for a transfer to the Human Resources department, but neither was granted.[49]  Morris was aware that Human Resources had ultimate control over requests for line transfers.[50]  Nevertheless, beyond filing the paperwork, she did not approach anyone in the Human Resources department about her desire to transfer, choosing instead to direct her follow up inquiries to TST Production Manager Jason Trussel and Assistant Production Manager Michael Adams; both repeatedly told her

---

*Inc.*, No. 8:99-CV-1371-T17MAP, 2003 WL 21981985, at * 1 (M.D. Fla. June 18, 2003) (holding that ambiguities in a sexual harassment policy "should be construed against the drafter").

[46] Morris Depo, Ex. 9, at 6-7 (emphasis supplied).

[47] Doc. no. 20, Statement of Undisputed Facts, ¶ 7.

[48] Morris Depo., at 100.

[49] *Id*. at 40-42.

[50] *Id*. at 41.

that they did not know the status of her requests, or that the requests could not be granted because line transfers were "frozen" at the moment.[51]  Morris alleges that news of her desire to transfer lines eventually reached Andrews himself, who asked her why she had chosen to "go around [him] to get off [his] line,"[52] and told her, in a manner that she perceived to be threatening, that she should be careful to avoid receiving written reprimands from him that could result in an immediate denial of any transfer request.[53]

In the course of Morris's conversations with Trussell and Adams about obtaining a line transfer, Morris articulated the reasons supporting her request, all of which appear to have revolved around Andrews.[54]  Specifically, Morris recalls inquiring about a line transfer and simultaneously complaining about Andrews's "hateful" attitude  "whenever [she] was at work."[55]  In November 2004, Morris supposedly told Trussell and Adams "about [Andrews's] sexual advances and how flirtatious [he was] and his comments and stuff."[56]  Morris testified that upon hearing these complaints, Trussell indicated that he was aware of the situation, but laughed

---

[51] *See id.* at 43, 45.

[52] *Id.* at 54.

[53] *See id.* at 54-55, 70-71.

[54] *See generally id.* at 42-43, 45-50, 59-60, 98-99, 101.

[55] *Id.* at 47.  *See also id.* at 49, 59-60, 98-99.

[56] *Id.* at 46.  *See also id.* at 98, 101.

about her predicament.[57]   This callous attitude evidently discouraged her from reporting other instances of perceived abuse, such as when she heard about Trussell himself characterizing her body as a "brick shit house."[58]

Twice in December, however, Morris says she complained to Andrews about Dakin's habit of cursing her on the line, and his vulgar, sexually-charged remarks.[59] Both times, Andrews allegedly stated that "he would handle it."[60]   For a time, the remarks ceased; but, as discussed above, Dakin re-commenced his verbal assaults during the buggy incident on January 24, 2005.   With that, Morris had apparently reached her limit, and she took her problems to Janice Fleming, TST's Second Shift Human Resources Coordinator.[61]

### D.   The Events Leading to Morris's Termination

A very emotional Morris approached Janice Fleming on January 24, 2005, just after Dakin had delivered his latest barrage of foul language, and reported his conduct to her.[62]   At the time, Morris did not tell Fleming about the alleged animosity between

---

[57] *Id*. at 45-46, 98, 101.  *See id.* at 101.

[58] *See id.* at 99, 103.

[59] *See id.* at 105-08.

[60] *Id*. at 105.  *See also id*. at 107-08.   Again, although the facts must be viewed in the light most favorable to the non-movant at this stage, the court notes that Andrews disputes ever hearing about Dakin's alleged vulgar remarks or sexually-suggestive banter.  Andrews Decl., ¶ 9; Affidavit of Richie Andrews ("Andrews Aff."), ¶ 4.

[61] *See* Morris Depo., at 119.  *See also id*. at 18.

[62] Doc. no. 20, Statement of Undisputed Facts, ¶ 37.

herself and Dakin, though she contends that Fleming should have known about that history because Andrews should have forwarded her complaints to Human Resources. Regardless, Fleming and Andrews initiated an immediate investigation of the events that were reported, and summoned Dakin and other employees who worked near Morris to explain what they heard transpire.[63]  One of these employees was Matthew Clemons.   While Clemons confirmed that Dakin directed unsavory language at Morris, he also stated that Morris responded by telling Dakin to "shut the f[uck] up."[64]   Based upon the evidence that both Dakin and Morris uttered profane expressions while working on the line, Fleming counseled both of them.[65]   A "counseling" is different from a "write-up," in that it does not count against an employee's performance record or affect entitlements or other terms of employment.[66]

The next night, Fleming and other supervisory personnel called Morris and Dakin separately into the Human Resources office and verbally warned them to refrain from using profane language at work.[67]  After the verbal warning, Andrews presented Morris with a form acknowledging the verbal counseling and asked her to

---

[63] Doc. no. 20, Statement of Undisputed Facts, ¶ 38.

[64] *Id*. at ¶ 40.  *See also id.* at ¶ 39.

[65] *Id*. at ¶ 41.

[66] *Id*. at ¶ 41.

[67] *Id*. at ¶ 43.

sign it.[68]  Morris refused to do so, and may have actually thrown the form back in front of Fleming.  A few moments of silence ensued, and then, without saying anything, Morris rose from her seat and left the room.[69]  After leaving the room, Morris gathered her belongings and prepared to exit the facility.  On her way out, she saw another trainer, Bo Stanton, standing on the other side of the assembly line from her and speaking on a Nextel two-way radio.  She allegedly called out to Stanton, saying "I'm going home, I'm sick."[70]  Morris twice testified that Stanton nodded his head to indicate that he understood.[71]  However, when asked more generally whether anyone heard her say she was leaving, Morris stated "I don't recall.  *I didn't check*."[72] Further, it is undisputed that Morris did not attempt to inform anyone other than Stanton that she was leaving.[73]

   According to Janice Fleming, "unauthorized departures from the line are very

---

[68] *Id.* at ¶ 45.

[69] *See*, *e.g.*, *id.* at ¶¶ 48, 49.

[70] Morris Depo., at 130.  Morris claims that Richie Andrews knew she was sick, because at the beginning of her shift that day, she had informed him that she was suffering from an ear ache and general malaise.  *See id.* at 127.

[71] *Id.* at 128, 129.

[72] *Id.* at 130 (emphasis supplied).  Stanton's account of the exchange conflicts with the account provided by Morris.  In an affidavit submitted in support of TST's motion for summary judgment, Stanton swore that he observed Morris "walking deliberately out the back door of TS' manufacturing plant," made eye-contact with her, and called out "Stacy, Stacy," but "Morris did not respond . . . in any way."  Affidavit of Bo Stanton ("Stanton Aff."), ¶ 3.  Stanton further stated that he "did not nod [his] head toward Ms. Morris in response to anything that she said."  *Id.*

[73] Doc. no. 20, Statement of Undisputed Facts, ¶ 54.

disruptive to production" and, thus, "TS[T's] policy and practice is to immediately terminate any employee who walks off the line without giving proper notice."[74]  This policy is codified in TST's Employee Handbook.  In the section entitled "Work Guidelines," "[w]alking off the job / leaving the plant without notification or permission" is listed as a violation that "may warrant immediate termination or at the very least skipping progressive disciplinary steps."[75]   Another section of the handbook, labeled "Leaving The Plant Before Your Shift Ends," counsels employees as follows:

> If it should become necessary for you to leave the plant (emergencies, *illness*, etc.), during your shift, you must notify *your immediate supervision*.  Should the supervision be unavailable, you should notify the *Human Resource department*.  If at any time you leave the plant without following the notification procedure, management will assume that you have voluntarily resigned your position with TST-AL and your separation will be processed.[76]

Morris's immediate supervisor was Richie Andrews.[77]  Whether Stanton — who is a trainer — could be considered "supervision" is unclear, but Morris testified that on two previous occasions, she had been excused from the line by Chris Dakin, who also

---

[74] Declaration of Janice Fleming ("Fleming Decl."), ¶ 9.  *See also* Affidavit of Renea Bradley ("Bradley Aff."), ¶ 4 (explaining that walking off the line without explanation is a terminable offense at TST).

[75] Morris Depo., Ex. 9, at 6-2 (emphasis deleted).

[76] *Id*. at 7-10 (emphasis supplied) (paragraph formatting altered).

[77] Doc. no. 26, Statement of Undisputed Facts, ¶ 86; Andrews Decl., ¶ 2.

-17-

is a trainer.[78]

In any event, Fleming did not consider Morris's notification sufficient.  After hearing of the departure, she terminated Morris's employment effective immediately. Fleming explained her decision as follows:

> Because Ms. Morris tossed the Written Record of Counseling Session to the middle of the table, walked out on our meeting before I adjourned it, gathered her personal belongings and did not report back to the assembly line, I made the decision to discharge her for walking off of the line.  I did not speak with Bo Stanton about Ms. Morris that night or at any other time before making the decision to discharge her, and I received no indication that Ms. Morris had mentioned to Bo Stanton or anyone else that she didn't feel well.  If she needed to leave work for a medical reason, then Ms. Morris could have mentioned it in the meeting or requested medical leave by completing the paperwork that is kept in Human Resources.[79]

### E.  Morris is Informed of Her Termination

Not knowing that she had been discharged, Morris returned to TST's Human Resources department the next day, January 26, 2005, to complete the required leave of absence paperwork.[80]  At the time, she also produced a doctor's note indicating that she was suffering from strep throat.[81]  Later that evening, Morris spoke with Fleming on the telephone, and Fleming informed her of the termination and the grounds

---

[78] Morris Depo., at 129.

[79] Fleming Decl., ¶ 8.

[80] Doc. no. 20, Statement of Undisputed Facts, ¶ 58.

[81] *Id*. at ¶ 59.

therefor.[82]  Because Morris did not feel this action was justified, she returned to TST a few days later to speak with then-Human Resources Coordinator Renea Bradley.[83] During this meeting, Morris told Bradley (for the fist time) about Andrews's alleged sexual advances and retaliatory conduct.[84]  Bradley was reportedly incredulous, at one point asking Morris, "how do I know you are not just telling me this because you got terminated[?]"[85] On the other hand, Bradley did perform an investigation of whether the decision to terminate Morris was fair and consistent with TST's policies.[86]  After interviewing several employees — two of whom stated that they had not observed Andrews treating Morris in a "mean" manner, and another of whom stated that Morris had used profanity on the line — Bradley upheld the decision to terminate Morris's employment for walking off the line.[87]

Morris subsequently filed this lawsuit, which includes a veritable laundry list of causes of action, ranging from negligence to sexual harassment, sex discrimination, retaliation, and wrongful termination.  Although her claim of sexual harassment is easy enough to pinpoint, the other claims in the complaint are exceedingly murky and

---

[82] Morris Depo., at 134.

[83] Doc. no. 20, Statement of Undisputed Facts, ¶ 61.

[84] Morris Depo., at 136-37.

[85] *Id*. at 137.

[86] Doc. no. 20, Statement of Undisputed Facts, ¶ 66.

[87] Bradley Aff., ¶¶ 5-7.

undefined.  The summary judgment opposition papers filed by plaintiff's counsel also do very little to focus the claims; indeed, if anything, the waters are mudded by counsel's careless intermingling of distinct legal concepts and failure to present arguments in the familiar format for employment discrimination cases.  Although hobbled by these factors, the court will address each claim with as much precision as possible.

**PART THREE**

*Discussion*

**A.      Hostile Work Environment**

Title VII of the Civil Rights Act of 1964 prohibits sex-based discrimination that alters the terms and conditions of employment.  *Nurse "BE" v. Columbia Palms West Hospital Limited Partnership*, 490 F.3d 1302, 1308 (11th Cir. 2007) (citing 42 U.S.C. § 2000e-2(a)(1)).

> An employee can establish a violation [of Title VII] against an employer in either of two ways:  1) through tangible employment action — i.e., discharge, demotion, pay decrease, etc.; or 2) through creation of a hostile work environment caused by sexual harassment that is sufficiently severe or pervasive to alter the terms and conditions of the work.

*Id*. (citing *Baldwin v. Blue Cross / Blue Shield of Alabama*, 480 F.3d 1287, 1300 (11th Cir. 2007).

-20-

Here, the complaint alleges both types of discrimination, but the parties devote a large portion of their briefing to the hostile work environment claim. To succeed on this claim, it must be shown that Morris: (1) belongs to a protected group; (2) was subjected to unwelcome sexual harassment; (3) the harassment was based upon her sex; (4) the harassment was sufficiently severe or pervasive as to alter the terms and conditions of her employment; and (5) there is a basis for holding her employer responsible under a theory of either vicarious or direct liability. *See*, *e.g.*, *Walton v. Johnson & Johnson Services*, *Inc.*, 347 F.3d 1272, 1279-80 (11th Cir. 2003); *Johnson v. Booker T. Washington Broadcasting Service*, *Inc.*, 234 F.3d 501, 508 (11th Cir. 2000). *See also generally Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Burlington Industries*, *Inc. v. Ellerth*, 524 U.S. 742 (1998).

The first three elements are not in dispute. As a female, Morris belongs to a protected group. *See Henson v. City of Dundee*, 682 F.2d 897, 902 (11th Cir. 1982) ("As in other cases of sexual discrimination this [element] requires a simple stipulation that the employee is a man or a woman."). Further, taking Morris's deposition testimony as true, it appears she was subjected to sex-based comments and behavior that she considered unwelcome. TST argues, however, that the fourth and fifth elements are lacking.

**1.     Was the Harassment Severe or Pervasive?**

The requirement that the alleged harassment be sufficiently severe or pervasive to alter the terms and conditions of Morris's employment contains both objective and subjective components. *See Faragher*, 524 U.S. at 787. In other words, to avoid summary judgment it must be established *both* that Morris subjectively believed the environment to be hostile or abusive, *and* that a reasonable person in her situation also would perceive it as such. *See, e.g., Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993). TST makes no effort to discredit Morris's claim that she subjectively perceived the harassment to be severe or pervasive, but vigorously contests the allegation that a reasonable person in her situation would share that perception.

When evaluating the *objective* severity of offensive conduct, courts examine the totality of the circumstances, including such factors as: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct was threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interfered with plaintiff's work performance. *See, e.g., Booker T. Washington*, 234 F.3d at 509 (quoting *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999)); *Edwards v. Wallace Community College*, 49 F.3d 1517, 1521 (11th Cir. 1995). It is not necessary to prove each of the factors individually. Nevertheless, the factors, taken together, must reveal conduct that is so extreme as to cause a material change in the terms and conditions of employment, and to create a working environment that

a reasonable person would find discriminatorily abusive.  *See*, *e.g.*, *Faragher*, 524

U.S. at 788 (citations omitted).

Looking first to the frequency of the conduct, Morris identifies two incidents

of physical contact, and around six incidents (depending upon what is considered one

incident) during which verbally abusive remarks were uttered over the course of

approximately five months.  One of the incidents of physical conduct — the alleged

groping and kissing perpetrated by Andrews in September 2004 — occurred away

from the workplace at a private, non-work-related party.  Because of that, TST argues

that the court should exclude the incident from consideration.  The authors of one

treatise have written that "[t]he circuits are split as to whether th[e] 'totality of the

circumstances' [analysis] contemplates an assessment of non-workplace conduct."

1 Barbara T. Lindemann & Paul Grossman, *Employment Discrimination Law* 1338-39

(4th ed. 2007) (citing *Gowesky v. Singing River Hospital System*, 321 F.3d 503, 510-

11 (5th Cir. 2003) (holding that, to be actionable, harassment "must affect a person's

working environment"); *Crowley v. L.L. Bean, Inc.*, 303 F.3d 387, 409 (1st Cir. 2002)

(holding that it is proper to "permit evidence of non-workplace conduct to help

determine the severity and pervasiveness of the hostility in the workplace as well as

to establish that the conduct was motivated by gender")).  *See also*, *e.g.*, *Doe v.

Oberweis Dairy*, 456 F.3d 704, 715 (7th Cir. 2006) (holding that, when an incident

of harassment occurs outside of the workplace, it may nevertheless be considered in the totality of the circumstances analysis, "[b]ut *at the very least* the harassment must . . . be an episode in a relationship that began and grew *in the workplace*") (emphasis supplied); *Ferris v. Delta Air Lines, Inc.*, 277 F.3d 128, 135 (2d Cir. 2001) (holding a flight attendant who was raped by a co-worker in her employer-furnished hotel room during a layover could state a hostile work environment claim because, under the "special set of circumstances" at issue in the case, the hotel room constituted "a part of [her] work environment").

Unfortunately, it appears the Eleventh Circuit has not yet weighed in on this issue, but there is some persuasive authority from district courts in the Circuit. *See, e.g., Geer v. Marco Warehousing, Inc.*, 179 F. Supp. 2d 1332, 1340 (M.D. Ala. 2001) (questioning whether an employer could be held responsible for threatening messages left on an employee's home answering machine by another employee); *Succar v. Dade County School Board*, 60 F. Supp. 2d 1309, 1314 n.8 (S.D. Fla. 1999) (rejecting outright the argument that an employer could be responsible for "harassing phone calls at home and for 'stalking' behavior outside the workplace" on the ground that the employer has "no obligation . . . to monitor the activities of its employees outside the workplace"); *Meece v. Atlantic Southeast Airlines, Inc.*, No. 1:04-CV-3698-WSD-ECS, 2006 WL 2228937, at * 11 (N.D. Ga. Aug. 2, 2006) ("[W]hen the sexual acts

occur outside the work place, the plaintiff must identify sufficient facts from which to infer a nexus between the hostile sexual conduct and the employment.") (internal citations and quotations omitted).

Reading these local decisions alongside persuasive circuit court cases from around the country, this court finds the nexus theory for evaluating harassment that occurs outside of work far preferable to an inflexible rule that either wholly endorses or wholly bars consideration of such harassment. *See Meece*, 2006 WL 2228937, at * 11. The nexus theory is grounded in common sense and fairness. It implicitly acknowledges that relationships which begin in the workplace often carry over into employees' private lives, but also ensures that employers are not held liable for conduct that, in truth, has little impact on the working environment. *See*, *e.g.*, *Doe*, 456 F.3d at 716 ("Had Nayman met Doe on the last day of either his or her employment at the ice cream parlor and later asked her for a date that eventually culminated in sexual intercourse, the connection to the workplace would have been too attenuated to constitute workplace harassment.").

Under the nexus theory, where the workplace is the primary venue for harassment, but the discriminatory treatment does not end when the whistle blows, the off-the-clock events may be considered in the analysis of the totality of circumstances because they represent a continuation of the hostile working

environment. Likewise, where the harassment begins during non-work hours, but follows the employee to work as well, it makes sense to consider the entire course of offensive behavior in determining whether the office dynamic has been changed. *See Crowley*, 303 F.3d at 409 ("In this case, Juhl's intimidating behavior and hostile interactions with Crowley outside of work help explain why she was so frightened of Juhl and why his constant presence around her at work created a hostile work environment."). Conversely, where harassment occurs exclusively outside of work, and simply does seep into the workplace, it is difficult to comprehend the rationale for concluding that the terms and conditions of the working environment have been altered. *See Meece*, 2006 WL 2228937, at * 12 (refusing to consider off-the-clock incidents because "virtually all" of the harassment at issue in the case occurred "while Plaintiff and Mr. McCoy were off-duty and off Defendant's work premises"). *See also Alvey v. Rayovac Corp.*, 922 F. Supp. 1315, 1330 (W.D. WI 1996) ("The evidence of the after-hours party involving the 'suck and blow' game has no relevance to plaintiff's workplace environment. Even top level executives are entitled to make fools of themselves after work and on their own time."). Moreover, it seems fundamentally unfair to hold the employer liable for off-the-premises conduct unless the employer somehow facilitated the harassment through official action. *See Succar*, 60 F. Supp. 2d at 1314 n.8 (noting that the employer has "no obligation . . . to monitor

the activities of its employees outside the workplace").

Here, TST clearly played no role in organizing the private party at which Morris was allegedly kissed and groped. Although Andrews allegedly excused Morris and another female employee from overtime work in order to attend the party, it is not at all clear that this arrangement was part of a premeditated plan to seduce Morris; in other words, the accommodation and subsequent sexual episode did not grow out of harassment in the workplace. Nor is there any evidence that allowing Morris to leave work precisely at the end of her shift on this one occasion unreasonably interfered with her ability to do her job. *Cf. Meece*, 2006 WL 2228937, at * 13 (refusing to consider after-hours harassment in part because there was no evidence that the plaintiff's job performance was affected by the harassment).

Morris does claim that her refusal to accede to Andrews's sexual advances had ramifications in the workplace, but there is very little evidence to support that argument. Testimony indicates that the only time Andrews's come-on was explicitly or implicitly discussed at work was the first business day after the party, when Andrews took it upon himself to apologize to Morris, and stated that his behavior would not be repeated. It is undisputed that Andrews kept his word: he made no further sexual or romantic overtures toward her, be they verbal or physical in nature. For this reason, the argument of plaintiff's counsel — that Andrews "continued to

-27-

sexually harass [Morris] in the workplace" after the party incident[88] — is completely unfounded.  Morris's claim that Andrews began treating her "mean" and "hateful" after the party incident does nothing to buttress this charge, either.  She complains (without offering much in the way of specifics) that Andrews treated other women better than her and offered them superior assistance in performing their jobs — but even taking that allegation as true, it hardly suffices to show a nexus between the one-time incident at the party and her subsequent working environment.  Stated slightly differently, Morris fails to point to any facts indicating that Andrews's refusal to offer the same assistance to her that he offered to other female workers was connected to her refusal to submit to his sexual desires.  She does not, for example, allege that the women who enjoyed favorable treatment allowed Andrews to have his way with them.  Nor do Morris's allegations that Andrews cautioned her to avoid accumulating written write-ups, and forced her to wait when she asked to use the restroom, substantiate her claim that he "sexually harass[ed]" her at work.

As stated above, excluding the off-premises encounter with Andrews in September 2004, Morris identifies one incident of physical contact, and six incidents during which vulgar remarks were uttered over the course of approximately five months.  This conduct was not so frequent as to fairly be characterized as "pervasive."

---

[88] Doc. no. 26, at 32.

*Compare Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002) (holding that verbal ethnic slurs uttered by a co-employee "three to four times a day," throughout the approximately one-month period plaintiff worked with the employee, were sufficiently frequent), *and Johnson*, 234 F.3d at 509 (holding that "roughly fifteen separate instances of harassment over the course of four months" was sufficiently frequent), *with Mendoza*, 195 F.3d at 1248-49 (holding that four incidents over an eleven-month period were insufficiently frequent), *Shepherd v. Comptroller of Public Accounts of Texas*, 168 F.3d 871, 872-75 (5th Cir. 1999) (holding that *several* incidents over a two-year period were insufficient), *Baskerville v. Culligan International Co.*, 50 F.3d 428, 430 (7th Cir. 1995) (holding that nine instances of offensive behavior over seven months were insufficient), *and Scott*, 92 F. Supp. 2d at 1322-24 (holding that seven incidents of sexual remarks over approximately seven months were insufficient).  *See also generally Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 263 (5th Cir. 1999) ("All of the sexual hostile environment cases decided by the Supreme Court have involved patterns or allegations of extensive, longlasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiffs' work environment.").

This lack of pervasiveness is not fatal to plaintiff's claim *if* the conduct complained of can be considered objectively "severe."  In addition to considering

frequency, courts evaluate severity by asking whether the conduct was threatening or humiliating, or a mere offensive utterance, and whether the conduct unreasonably interfered with plaintiff's work performance. *See*, *e.g.*, *Booker T. Washington*, 234 F.3d at 509; *Edwards*, 49 F.3d at 1521. Therefore, the remaining incidents identified by Morris must be examined "in context, not as isolated acts, [in order to] determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment." *Mendoza*, 195 F.3d at 1246. *See also Husley v. Pride Restaurants, LLC*, 367 F.3d 1238, 1248 (11th Cir. 2004) ("In a sexual harassment case the totality of the circumstances must be considered, because context is important."). That said, it is difficult to meaningfully analyze the impact of the incidents without first separating them out and looking to each individually. Accordingly, the court inventories each event and then considers the combined impact of all instances of alleged harassment.

This analysis starts with the other instance of physical contact: *i.e.*, the time when co-worker Chris Dakin "nudged" Morris's breast. By Morris's own description, this "nudge" appears to have been incidental and inadvertent. Even assuming it was intentional, however, this isolated and apparently non-threatening touching adds little to plaintiff's case. *Cf. Meriwether v. Caraustar Packaging Co.*, 326 F.3d 990, 993 (8th Cir. 2003) (finding that an incident in which a co-worker

grabbed the plaintiff's buttocks was not "severe"); *Mendoza*, 195 F.3d at 1247 (refusing to find hostile work environment where the plaintiff's supervisor, *inter alia*, intentionally "rubbed his hip against [the plaintiff's] hip while touching her shoulder").  While Dakin allegedly followed up with an insolent remark about how Morris had "enough to spare," this is more of an offensive utterance than a humiliating or threatening comment.  *See Mendoza*, 195 F.3d at 1248.  *Cf. Scott v. Pizza Hut of America*, 92 F. Supp. 2d 1320, 1326 (M.D. Fla. 2000) (statement that "[i]f [plaintiff would] go out and get some sex, she wouldn't be so bitchy" found "boorish, stupid, and inconsiderate," but not sufficient to support hostile work environment claim) (first bracketed alteration in original); *Alvey*, 922 F. Supp. at 1330 ("The horny women remark was boorish but nothing more.").  This type of statement simply does not rise to the level of severe harassment.  *See, e.g., Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir. 1998) (holding that an incident in which a co-worker told the plaintiff that she had been voted "the 'sleekest ass' in the office" was not "of sufficient severity to alter the conditions of [the plaintiff's] employment").  Similarly, as crude as it was, Dakin's alleged statement that he would like to engage in anal sex with Morris falls into the offensive utterance category as well, especially since Morris evidently did not view it as threatening.  *See, e.g., id.*

Morris also alleges that she was told about a supervisory employee discussing

-31-

her physical attributes, and overheard male workers waging bets over which women they could persuade to have sexual relations — but "the impact of [such] 'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff." *Russell v. Board of Trustees of the University of Illinois at Chicago*, 242 F.3d 336, 343 (7th Cir. 2001) (some internal quotations omitted) (alteration in original). *See also Hudson v. Norfolk Southern Railway Co.*, 209 F. Supp. 2d 1301, 1331 n.11 (N.D. Ga. 2001) ("[I]t is well-established that slurs and insults heard second-hand do not carry the same severity as those made to the employee's face."). *Cf. Quinn*, 159 F.3d at 768 (holding that an incident in which a co-worker told the plaintiff that she had been voted "the 'sleekest ass' in the office" was not "of sufficient severity to alter the conditions of [the plaintiff's] employment").

There were two more, starkly-offensive comments.  At one point, Dakin allegedly called Morris a "stupid bitch."  Because of the well-known misogynistic connotation of the word "bitch," the court is especially sensitive to its use in the workplace. *See*, *e.g.*, *Colon v. Environmental Technologies, Inc.*, 184 F. Supp. 2d 1210, 1218 (M.D. Fla. 2001) (concluding that the Spanish expletive "perra," which translates roughly into the English words "bitch" or "whore," "might be found disproportionately more offensive or demeaning to a woman insofar as such insults are not generally used toward men and carry a connotation that is more demeaning

-32-

of women than men"); *Russell*, 242 F.3d at 343 (noting as an ameliorating factor that the plaintiff "does not allege that she was ever called a whore or a bitch"). *But see Mendoza*, 195 F.3d at 1248 (citing with approval a Seventh Circuit decision in which the court held that "the term 'sick bitch' is not necessarily a sexual or gender-related term") (citation omitted). When placed together with Dakin's other (temporally distinct) remark about how Morris should either do her job or "go to the F'ing house" — a possible vague reference to the defunct "separate sphere" ideology so prominent in this country during the nineteenth century — the court can certainly understand why Morris claims offense. Still, these two utterances are not so severely degrading, threatening, or humiliating as to create a hostile work environment on their own.[89] *See Harris*, 510 U.S. at 21 ("A mere utterance of an . . . epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII."); *Hudson*, 209 F. Supp. 2d at 1330 ("The prevailing view . . . appears to be that mere insults by non-supervisors are insufficient to support a claim of hostile work environment absent some aggravating factor, such as physically intimidating conduct accompanying the slurs."). *Cf. Ferris*, 277 F.3d

---

[89] The court has not overlooked Morris's claims that Dakin also called her a "F'ing retard," and once told her to "move those MF'ing buggies." Rather, even after studying the context in which they were uttered, the court perceives nothing even vaguely sexual about these otherwise acerbic and inflammatory statements, and therefore does not consider them highly significant for present purposes.

at 136 ("We have no doubt that a single incident of *rape* can satisfy the [severity requirement].").

Moreover, even when viewed in conjunction with the other comments Morris endured over the course of her five months on Andrews's rear 60 assembly line, as well as the isolated breast nudging incident, the misogynistic remarks uttered by Dakin did not create a legally redressable hostile working environment. The only incident of physical contact that is subject to consideration was arguably accidental, and was, in any case, minor and non-threatening. Likewise, while all the remarks complained of were boorish and at times downright mean, none were threatening, and several were heard second-hand. Finally, Morris does not claim that any of the remarks negatively affected her ability to perform her duties at TST. Accordingly, the court holds that plaintiff has failed to establish a *prima facie* case of hostile working environment, and pretermits discussion of the possible bases of employer liability.

## B.    Sex Discrimination

Plaintiff asserts that TST discriminated against Morris on the basis of her sex in ways other than subjecting her to a sexually hostile working environment. For example, the complaint alleges that Morris was "subjected to harsher discipline . . .

and unequal terms of employment."[90]   TST argues that plaintiff has failed to put

forward sufficient evidence to meet the burden of proof on this claim.  In responding

to TST's motion for summary judgment, plaintiff's counsel essentially ignores the sex

discrimination claim, and, in any case, the court agrees with TST's assertion.[91]

To make out a *prima face* case of sex-based discrimination, plaintiff must show

"that (1) [she] is a member of a protected class; (2) [she] suffered an adverse

---

[90] Doc. no. 1, ¶ 31.

[91] Issues and contentions not raised in a party's brief are deemed abandoned.  *See, e.g.*, *Chapman v. AI Transport* 229 F.3d 1012, 1027 (11th Cir. 2000) (*en banc*) ("Parties opposing summary judgment are appropriately charged with the responsibility of marshaling and presenting their evidence before summary judgment is granted, not afterwards."); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (holding that a district court can "properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment") (citing *Lazzara v. Howard A. Esser, Inc.*, 802 F.2d 260, 269 (7th Cir. 1986) (holding that a ground not pressed in opposition to a motion for summary judgment is to be treated by the district court as abandoned)).  *Cf. U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1287 n.13 (11th Cir. 2007) (refusing to address a party's "perfunctory and underdeveloped argument") (citing *Flanigan's Enterprises, Inc. v. Fulton County*, 242 F.3d 976, 987 n.16 (11th Cir. 2001) (holding that "fail[ure] to elaborate or provide any citation of authority in support [of an argument]" results in waiver)).

> In opposing a motion for summary judgment, "a party may not rely on his pleadings to avoid judgment against him." *Ryan v. Int'l Union of Operating Eng'rs, Local 675*, 794 F.2d 641, 643 (11th Cir. 1986).  There is no burden on the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.  *Blue Cross & Blue Shield v. Weitz*, 913 F.2d 1544, 1550 (11th Cir. 1990).  Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned[.]

*Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (some citations omitted).  Accordingly, the court holds that plaintiff's sex discrimination claim is due to be dismissed on both substantive and procedural grounds.

employment action; (3) [defendant] treated similarly situated employees outside of the protected class more favorably; and (4) [she] was qualified to do the job." *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1228 (11th Cir. 2002) (emphasis supplied) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)); *Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001)). *See also*, *e.g.*, *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

Plaintiff has produced no evidence that similarly-situated male employees were treated more favorably than Morris. For example, Morris complains that she was made to wait for restroom breaks, was not permitted to transfer off Andrews's assembly line, and was not provided proper tools for a particular assignment referred to as "j-clipping." However, Morris does not identify males who were allowed to use the restroom more frequently than she, who were allowed discretionary transfers to other lines, or who were provided the proper tools for "j-clipping." Absent such evidence, there is no basis for a claim of sex-based disparate treatment. *See*, *e.g.*, *Manicca v. Brown*, 171 F.3d 1364, 1368-69 (11th Cir. 1999); *Reno*, 115 F.3d at 1562-63; *Geer*, 179 F. Supp. 2d at 1341-42. Moreover, Morris candidly admitted in her deposition that she never received any formal discipline prior to her termination — only verbal counselings that did not adversely affect her standing as an employee. Thus, summary judgment is due to be granted on plaintiff's claim of sex-based

discrimination.

## C.      Retaliation

Plaintiff also claims that she was retaliated against for resisting Andrews's attempted seduction at the party in September 2004, and for complaining about the alleged harassment during her employment at TST.  "Retaliation is a separate violation of Title VII." *Gupta v. Florida Board of Regents*, 212 F.3d 571, 586 (11th Cir. 2000). In the absence of direct evidence of retaliatory motive, the *McDonnell Douglas* burden shifting analysis applies to retaliation claims under Title VII.  *See Hurlbert v. St. Mary's Health Care System*, *Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006). *See also generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that formulation, "[i]f the plaintiff makes out a prima facie case, the burden then shifts to the defendant to articulate a legitimate reason for the adverse action." *Hurlbert*, 439 F.3d at 1297.  "If the defendant does so, the plaintiff must then show that the defendant's proffered reason for the adverse action is pretextual."  *Id*.

A *prima facie* case of retaliation requires proof of three elements:  (1) that Morris engaged in statutorily protected activity — *i.e.*, "opposed any practice made an unlawful employment practice by [Title VII], or . . . made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]," 42 U.S.C. § 2000e-3(a); (2) that she thereafter suffered an adverse

employment action; and (3) that there is a causal linkage between the participation in protected activity and the employer's adverse employment action.  *E.g.*, *Hurlbert*, 439 F.3d at 1297; *Shannon v. BellSouth Telecommunications, Inc.*, 292 F.3d 712, 715 (11th Cir. 2002); *Bass v. Board of County Commissioners*, 256 F.3d 1095, 1117 (11th Cir. 2001); *Gupta*, 212 F.3d at 587; *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998).

As foreshadowed above, plaintiff's complaint indicates that her retaliation claim is two-pronged:  *i.e.*, that she was retaliated against *during* her employment by denial of transfers, unpleasant job assignments, etc.; *and* that she was *terminated* in retaliation for resisting the supposedly hostile work environment.[92]  Both variations of the claim fail on the merits.

Addressing the retaliatory termination claim, TST points out the absence of any evidence establishing that Janice Fleming — TST's Human Resources Administrator, who made the decision to terminate Morris — was aware of Morris's resistance to hostile workplace conditions prior to January 24, 2005.  *See*, *e.g.*, *Raney v. Vinson Guard Service, Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997) ("[A] plaintiff must, at a

---

[92] *See* doc. no. 1, ¶ 37 ("The plaintiff has been discriminated against because of her sex, female, in that she was subjected to retaliation after engaging in protected activity[.]"); *id.* at ¶ 40 ("The plaintiff has been discriminated against because of her sex, female, in that she was pretextually terminated in retaliation for engaging in protected activity[.]").

minimum, generally establish that the defendant was actually aware of the protected expression at the time the defendant took the adverse employment action."). Indeed, it is undisputed that Morris never told Fleming about any of the alleged incidents of harassment by Andrews, Trussell, or other TST employees prior to that date.[93] Although Fleming was aware of Dakin's profane remarks on January 24, 2005, she counseled Dakin *and* Morris for that incident, and obviously nothing about that decision suggests an intent to punish Morris for her protestations.

To the extent that the close temporal proximity between Morris's complaint about Dakin on January 24th and her termination the next day might be used to establish causation, *see Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000), it should be noted that TST articulated a legitimate, nondiscriminatory reason for the termination: *to wit*, Morris walked off the line without following TST's notification procedure, which requires employees who leave during their shift to make their intent to do so clear to either the Human Resources department or to their immediate supervisor. Immediately before walking off the line,

---

[93] Plaintiff implies at one point that Fleming would have known about Morris's previous complaints of discrimination through talking with Andrews, but there is no actual evidence to support that tenuous hypothesis, and plaintiff's conjectural insinuations are not sufficient. *Cf. Clover v. Total System Services, Inc.*, 176 F.3d 1346, 1355 (11th Cir. 1999) ("The evidence that Miller and Hollingsworth spoke in the time period between Clover's participation in the investigation and Miller's decision to terminate her shows, at the most, that Hollingsworth could conceivably have told Miller about Clover's participation. But because 'could have told' is not the same as 'did tell,' it would be pure speculation [to draw that inference].").

Morris had been in Janice Fleming's office with both Fleming and her immediate supervisor, Richie Andrews. She left that office without notifying either of these individuals that she needed to leave her shift for medical reasons. Although Morris made some effort to inform trainer Bo Stanton that she was leaving, Andrews, not Stanton, was her immediate supervisor.[94] Clearly, therefore, Fleming had a legitimate basis for terminating Morris's employment, and Morris fails to identify any colorable evidence of pretext.[95]

---

[94] Even if Stanton *had been* Morris's immediate supervisor, her attempt to notify him that she was leaving is suspect. Stanton never verbally acknowledged Morris's statement that she was leaving, only nodding his head during the course of a conversation on his two-way radio with another individual. To infer that Stanton was nodding in response to Morris — something Stanton himself denies — would be to engage in prohibited speculation. *See*, *e.g.*, *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) ("[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation.").

[95] In support of her pretext argument, Morris alleges that a male employee, Zach Brooks, was not terminated after walking off the line without providing notice. However, Janice Fleming's declaration indicates that Brooks was permitted to leave the line pursuant to a previous application for intermittent leave under the Family and Medical Leave Act. *See* Fleming Decl., ¶ 10. Plaintiff has not come forward with any evidence to discredit this statement. *See*, *e.g.*, *Jackson v. Alabama State Tenure Commission*, 405 F.3d 1276, 1289 (11th Cir. 2005) (holding that, to assess pretext, "the district court must evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence") (internal quotations and citation omitted). Finally, Morris alleges that yet another male employee, Michael Adams, was allowed to turn in medical leave of absence requests late on several occasions, and was not terminated. The court has reviewed the request forms, but is unable to confirm from the somewhat cryptic entries that they were submitted after the fact. More fundamentally, it should be noted that even if the actual forms were untimely filed, there is no evidence in the record indicating how Adams left work: *i.e.*, Adams may well have provided notification of his intent to leave work to his immediate supervisor, something Morris did not do. Without *any* evidence whatsoever on this point, the court cannot simply choose to infer that Adams walked off the line without providing any notification. *See*, *e.g.*, *Daniels*, 692 F.2d at 1324 ("[A]n inference is not reasonable if it is only a

This leaves the retaliation claim focusing on Morris's treatment *during* her employment, which falters for other reasons. For instance, there is no evidence that Andrews blocked Morris's attempts to transfer off his line; rather, testimony establishes that line transfers were "frozen" during the relevant time period, and plaintiff comes forward with no evidence suggesting that this explanation is not worthy of credence. *See*, *e.g.*, *Jackson v. Alabama State Tenure Commission*, 405 F.3d 1276, 1289 (11th Cir. 2005) (holding that, to assess pretext, "the district court must evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence") (internal quotations and citation omitted).

As for the allegations that Morris was forced to perform unfavorable tasks such as "j-clipping," that she was not provided with the same level of step-by-step assistance as two other women who were allegedly favorites of Andrews's, and that she was forced to wait (for unspecified periods of time) to use the restroom, plaintiff makes no attempt to show that these seemingly trivial annoyances constitute adverse employment actions. *See Burlington Northern & Santa Fe Railway Co. v. White*, ___

---

guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation.").

U.S. ___, 126 S. Ct. 2405, 2415 (2006) (holding that "petty slights, minor annoyances, and simple lack of good manners" normally will not deter reasonable employees from reporting discriminatory conduct and, therefore, do not constitute adverse action); *Tran v. The Boeing Co.*, 190 Fed. Appx. 929, 932 n.3 (11th Cir. 2006) (holding that "receiving excess work" does not "rise to the level of an adverse employment act"). *See also*, *e.g.*, *Flanigan's Enterprises*, *Inc. v. Fulton County*, 242 F.3d 976, 987 n.16 (11th Cir. 2001) (holding that "fail[ure] to elaborate or provide any citation of authority in support [of an argument]" results in waiver).

## E.   Supplemental State Law Claims for Negligent and/or Wanton Training, Supervision, and Retention

All of plaintiff's remaining claims are based upon state law.  This court's jurisdiction over these claims is governed by 28 U.S.C. § 1367(a), which provides that:

> in any civil action in which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

Even so, "district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  This court exercises its

discretion and declines to exercise supplemental jurisdiction over plaintiff's remaining state law-claims. *See*, *e.g.*, *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims.").

## PART FOUR

### *Conclusion and Orders*

In accordance with the foregoing, defendant's motion for summary judgment is due to be, and the same is hereby, GRANTED. The federal claims in plaintiff's complaint are DISMISSED with prejudice, and her supplemental state-law claims are DISMISSED without prejudice. Costs are taxed to plaintiff. The Clerk is directed to close this file.

DONE and ORDERED this 26th day of March, 2008.

United States District Judge

-43-